[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-15167

_____

D.C. Docket No. 9:18-cv-81606-DMM

PINNACLE ADVERTISING AND MARKETING GROUP, INC.,

Plaintiff-Appellant,

versus

PINNACLE ADVERTISING AND MARKETING GROUP, LLC,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 2, 2021)

Before MARTIN, NEWSOM, and BRANCH, Circuit Judges.

BRANCH, Circuit Judge:

This appeal arises out of a trademark dispute between two advertising and marketing companies—both of which operate under the name Pinnacle Advertising and Marketing Group.  The Illinois-based Pinnacle owns two registered trademarks for the name "Pinnacle" and a stylized version of the word "Pinnacle."  It sued the Florida-based Pinnacle for trademark infringement and unfair competition under the Lanham Act.[1]  When a company sues to enforce its registered marks, it faces the risk of losing its marks' protection in the process.  After Pinnacle Illinois filed suit, Pinnacle Florida filed a counterclaim seeking to cancel Pinnacle Illinois's trademark registrations under 15 U.S.C. § 1119.[2]  Pinnacle Florida also alleged that Pinnacle Illinois's claims were barred by the doctrine of laches.

A jury eventually rendered a verdict in favor of Pinnacle Illinois on its infringement and unfair competition claims.  After Pinnacle Florida filed a post-trial motion for judgment as a matter of law, the district court disregarded the jury's findings that Pinnacle Illinois's marks were distinctive and thus trademark

---

[1]  This opinion will refer to the appellant, Pinnacle Advertising and Marketing Group, Inc., as "Pinnacle Illinois," and the appellee, Pinnacle Advertising and Marketing Group, LLC, as "Pinnacle Florida."

[2]  15 U.S.C. § 1119 provides:

> In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.  Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

protectable and cancelled the registrations under § 1119. The district court also found that Pinnacle Illinois's claims were barred by laches.

After careful review and with the benefit of oral argument, we conclude that the district court erred by disregarding the jury's findings that Pinnacle Illinois's marks were distinctive and protectable and misapplying the presumption of validity given to registered marks. Accordingly, we vacate and remand the district court's order cancelling Pinnacle Illinois's registrations. Further, although we affirm the district court's finding that Pinnacle Illinois's claims for monetary damages were barred by laches, we remand for the district court to consider whether to grant Pinnacle Illinois injunctive relief to protect the public's interest in avoiding confusion.

## I.    Background

Pinnacle Illinois has used the name "Pinnacle Advertising and Marketing Group, Inc." in connection with its advertising business since 1998. Pinnacle Florida has operated its advertising business under the name "Pinnacle Advertising and Marketing Group, LLC" since its formation in 2010. Although it is undisputed that Pinnacle Illinois learned of Pinnacle Florida's use of the "Pinnacle" name at some point before it filed the current lawsuit, the parties dispute exactly when Pinnacle Illinois obtained this knowledge.

3

### A.    Pinnacle Illinois's Knowledge of Pinnacle Florida

Pinnacle Florida contends that Pinnacle Illinois learned of its company in late 2013 or early 2014 when, during a client pitch meeting, the potential client— the Central Florida Honda Dealers Association—asked Pinnacle Illinois if it was affiliated with Pinnacle Florida.[3]  Pinnacle Illinois's initial response to an interrogatory stated that Pinnacle Illinois CEO Michael Magnusson "first became aware of Pinnacle (FL) in or around late 2013 . . . when pitching to . . . Central Florida Honda."  But Magnusson later testified at trial that he did not specifically learn of Pinnacle Florida at this meeting.  Rather, he testified that he overheard a conversation about a person at the meeting confusing Pinnacle Florida and Pinnacle Illinois, and he only later (after learning of Pinnacle Florida) connected the dots that the "Pinnacle" the potential client had referred to was Pinnacle Florida.

Pinnacle Illinois contends that it first learned of Pinnacle Florida in January 2015 when an industry magazine, Advertising Age, mistakenly linked Pinnacle Florida's website to an article about Pinnacle Illinois.  Magnusson testified at trial

---

[3]  Whether the Central Florida Honda pitch meeting occurred in late 2013 or January 2014 is unclear.  Pinnacle Florida asserts that the meeting occurred in late 2013, which is supported by Pinnacle Illinois's interrogatories from an earlier trademark suit filed by Pinnacle Illinois against Pinnacle Florida in Illinois.  The record shows that Pinnacle Illinois added Central Florida Honda as a client in January 2014 which implies that the pitch meeting occurred sometime before then.

that he was "horrified" at the mistake because the article was about Pinnacle Illinois's Super Bowl commercial and "all the eyes" in the industry were reading to see which advertisers created the all-important commercials that year. So Magnusson contacted a magazine employee to correct the mistake. Following the correction, Magnusson took no further action to rectify the confusion between the two companies because, judging from Pinnacle Florida's website, "[t]hey looked like a small agency" that focused on hospitality work and Pinnacle Illinois was "very busy" and "not . . . concerned about [Pinnacle Florida] at the time."

In January 2016, Advertising Age made the same mistake again. Magnusson once again contacted the magazine to seek a correction. Nevertheless, Pinnacle Illinois did not reach out to Pinnacle Florida or take further action at that time because its "priority was taking care of [its] clients" and it "didn't have the capacity to [take action] at that time."

### B.    Further Confusion and Registration

Customer confusion continued in the lead-up to this lawsuit. In addition to the Central Florida Honda pitch meeting and the two Advertising Age mix-ups, there was evidence of misdirected communications from current and prospective customers, misdirected invoices from vendors, and misdirected job applications.

Pinnacle Illinois filed for registration of the two marks at issue in this litigation with the Patent and Trademark Office ("PTO") on November 4, 2016,

5

and obtained registrations on September 12, 2017. Pinnacle Illinois obtained

registrations for "Pinnacle" as a word mark (U.S. Reg. No. 5,284,206) and the

following stylized form of the word "PINNACLE" (U.S. Reg. No. 5,284,223).

## PINNACLE

During the registration process, the PTO did not require Pinnacle Illinois to

provide proof that its marks had obtained secondary meaning.[4]

### C.    The Current Lawsuit

On April 4, 2018, over four years after the Central Florida Honda pitch

meeting and over three years after the first Advertising Age mistake, Pinnacle

Illinois sued Pinnacle Florida for trademark infringement in the Northern District

of Illinois, but the case was dismissed for lack of personal jurisdiction.

On November 21, 2018, Pinnacle Illinois filed this action against Pinnacle

Florida in the Southern District of Florida. Pinnacle Illinois brought claims for

trademark infringement of its '206 and '223 marks under 15 U.S.C. § 1114; unfair

competition under 15 U.S.C. § 1125(a); and cybersquatting under 15 U.S.C.

§ 1125(d).

---

[4] Secondary meaning "is the connection in the consumer's mind between the mark and the provider of the service." *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1560 (11th Cir. 1991). A mark that is only "descriptive" of the goods or services it refers to requires proof of secondary meaning to be trademark protectable. *Id.* at 1559. Other marks are inherently distinctive and require no proof of secondary meaning to be protectable. *Id.*

Pinnacle Florida filed its answer to Pinnacle Illinois's complaint, which asserted, among other things, an affirmative defense that Pinnacle Illinois's claims were barred by the doctrine of laches. Shortly thereafter, Pinnacle Florida filed an amended counterclaim which asserted six claims, including a claim for cancellation of Pinnacle Illinois's registered mark No. 5,269,641 (a different registered mark than the two at issue in this case) under 15 U.S.C. § 1119.

Pinnacle Illinois then moved to dismiss all of Pinnacle Florida's counterclaims and to strike its affirmative defenses. As to the cancellation counterclaim, Pinnacle Illinois responded that the '641 registration was not at issue in this case. Thus, Pinnacle Illinois argued that the district court did not have jurisdiction to cancel the '641 registration under § 1119.

In response, Pinnacle Florida acknowledged that it could not seek cancellation of the '641 registration in this case and explained that "[it] intends to file a motion seeking leave to amend (if it is unable to reach agreement on leave to amend with [Pinnacle Illinois])." Pinnacle Florida attached a draft cancellation counterclaim (seeking cancellation of the '206 and '223 registrations) to its response. Pinnacle Florida did not formally seek leave to amend its counterclaim or attempt to reach an agreement with Pinnacle Illinois.

The district court granted in part and denied in part Pinnacle Illinois's motion to dismiss/strike Pinnacle Florida's counterclaims and affirmative defenses.

7

As to the cancellation counterclaim, the district court acknowledged that it could

not consider the '641 mark in this case. It then stated:

> While [Pinnacle Florida] never sought leave to amend the
> Counterclaim, it represented that it would confer with [Pinnacle
> Illinois] as to whether an Amended Counterclaim would be permitted
> and attached a proposed amended cancellation or restriction of
> registration counterclaim to its response to the present Motion. . . .
> Although the time to amend the Counterclaim has passed, I will allow
> Defendant to proceed with the proposed amendment . . . in the interest
> of fairness. I make this conclusion because [Pinnacle Florida]
> conceded that it identified an incorrect mark when drafting the
> Counterclaim, attempted to resolve the amendment issue with
> opposing counsel amicably, and attached the proposed Amended
> Counterclaim to the response to the present Motion. Accordingly, I
> will not dismiss [the cancellation counterclaim], as amended.

Pinnacle Illinois filed a motion for reconsideration of the district court's

order to the extent that it allowed Pinnacle Florida's cancellation claim to

proceed.[5] Pinnacle Illinois notified the court that Pinnacle Florida never conferred

with it about amending its cancellation counterclaim and never moved for leave to

amend (like it said it "intended" to do in response to Pinnacle Illinois's motion to

dismiss). Pinnacle Illinois did not request additional discovery or a continuance of

the trial.

---

[5] While Pinnacle Illinois's motion to dismiss/strike Pinnacle Florida's cancellation claim was pending, the parties moved for summary judgment. Because the summary judgment motions also remained pending, Pinnacle Illinois's motion for reconsideration requested, in the alternative, leave to amend its summary judgment motion.

The district court denied Pinnacle Illinois's motion for reconsideration.[6] The district court began by observing that its "ruling would have been the same even if [Pinnacle Florida] had not intended to confer with [Pinnacle Illinois] as to the counterclaim." The court further concluded that Pinnacle Illinois was not prejudiced by its decision to allow the amendment because Pinnacle Illinois was already prepared to prove its trademark infringement claim, which overlapped with its obligation to defend against the amended cancellation counterclaim.

During a pre-trial conference, Pinnacle Illinois represented that the cancellation counterclaim and the laches defense should be decided by the judge rather than the jury at trial. Specifically, the district court and Pinnacle Illinois had the following exchange:

> THE COURT:  And your position is [the Cancellation Counterclaim is] a legal issue and not for the jury?
> [PINNACLE ILLINOIS'S COUNSEL]:  Right.

As a result of this discussion, neither the cancellation counterclaim nor the laches defense were submitted to the jury.

Pinnacle Illinois's infringement, unfair competition, and cybersquatting claims were tried during a three-day jury trial. At the close of Pinnacle Illinois's case-in-chief, Pinnacle Florida moved for judgment as a matter of law on Pinnacle

---

[6]  The district court also denied Pinnacle Illinois's alternative request for leave to amend its summary judgment motion.

Illinois's cybersquatting claim, and the district court granted the motion. After trial, the jury returned a verdict in favor of Pinnacle Illinois on its claims for trademark infringement and unfair competition and awarded Pinnacle Illinois $550,000 in damages.

## D.    Post-Trial Rulings

After the verdict, Pinnacle Illinois filed its answer to Pinnacle Florida's amended cancellation counterclaim. Pinnacle Florida then moved for judgment as a matter of law on its laches defense and the amended cancellation counterclaim.[7]

The district court granted Pinnacle Florida's motion for judgment as a matter of law. It concluded that Pinnacle Illinois's trademark infringement and unfair competition claims were barred by laches because Pinnacle Illinois waited over four years to bring suit after it should have known of a potential infringement claim against Pinnacle Florida. The district court also cancelled Pinnacle Illinois's registrations under § 1119 because it concluded that Pinnacle Illinois's marks were merely descriptive and lacked secondary meaning. Pinnacle Illinois appealed.

## II.    Discussion

On appeal, Pinnacle Illinois argues the district court erred in four ways: (1) the district court allowed Pinnacle Florida to amend its cancellation

---

[7] Pinnacle Florida also sought to overturn the jury's verdict on trademark infringement and unfair competition and alternatively sought a new trial, remitter, and other forms of relief.

10

counterclaim ten days before trial even though Pinnacle Florida never formally moved to amend under Rule 15 of the Federal Rules of Civil Procedure; (2) the district court cancelled Pinnacle Illinois's registrations without regard to the jury's findings of distinctiveness and protectability or the presumption afforded to registered marks; (3) the district court abused its discretion in finding that Pinnacle Illinois's claims were barred by laches; and (4) even if laches barred Pinnacle Illinois's claims for money damages, the district court erred in failing to consider whether Pinnacle Illinois's requested injunctive relief was proper to protect the public's interest in avoiding confusion. We will address each of these arguments in turn.

## A.    Cancellation Counterclaim Amendment

Pinnacle Illinois argues that the district court should not have considered Pinnacle Florida's cancellation counterclaim for two reasons. First, Pinnacle Illinois argues that Pinnacle Florida did not follow the requirements of Rule 15 to amend its claim. Second, Pinnacle Illinois argues that the amendment prejudiced Pinnacle Illinois's ability to prepare its case. We do not find either argument persuasive.

11

We review a district court's decision on whether to grant a motion for leave to amend the pleadings for abuse of discretion.[8] *Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 760 (11th Cir. 1995). Outside of the time for an amendment as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15. Rule 15 further provides that a district "court should freely give leave when justice so requires." *Id.* While allowing an amendment is a discretionary decision, we have explained that district courts should generally exercise their discretion in favor of allowing amendments to reach the merits of a dispute. *See Shipner v. E. Air Lines, Inc.*, 868 F.2d 401, 406–07 (11th Cir. 1989) (explaining that Rule 15's policy of "liberally permitting amendments to facilitate [the] determination of claims on the merits circumscribes the exercise of the district court's discretion"). Leave to amend should be "freely given when justice so requires" unless there is an "apparent or declared reason" to deny it such as "undue prejudice to the opposing party." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006).

---

[8] Pinnacle Illinois argues that because the district court amended the cancellation counterclaim in its order denying Pinnacle Illinois's motion to dismiss, we should review the district court's decision *de novo*. We disagree. Although Pinnacle Florida did not move to amend under Rule 15, the district court construed its stated intent to do so—coupled with its submission of a proposed amended counterclaim—as a motion for leave to amend. The district court exercised its discretion when it allowed Pinnacle Florida to amend its counterclaim, so we will apply the usual abuse-of-discretion standard.

Pinnacle Illinois appears to argue that the district court lacked authority to allow Pinnacle Florida to amend its cancellation counterclaim *sua sponte* because Pinnacle Florida never formally moved for leave under Rule 15.  We have previously held that district courts have broad discretion to allow pleading amendments even when a party does not formally request leave.  *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (*en banc*) (holding that a "district court is not *required* to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court" (emphasis added)).  Indeed, we neither require a district court to amend a pleading *sua sponte* nor forbid it.  *Id.*  Rule 15 allows amendment with the "court's leave" and emphasizes that district courts "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  To the extent Pinnacle Illinois asks us to graft on to Rule 15 a formal requirement that a party seek leave from the district court to amend its pleadings, we decline to do so.

Pinnacle Illinois's next argument—that the district court's decision to allow the amendment ten days before trial unduly prejudiced it—is likewise unavailing. Although a party in some situations may be unduly prejudiced by learning of a new claim only ten days before trial, Pinnacle Illinois was not prejudiced here for several reasons.  First, Pinnacle Illinois spent much of its opening brief explaining

13

why its defense to the cancellation counterclaim largely overlapped with its trademark infringement claim (which it was already prepared to take to trial). Second, Pinnacle Illinois could not articulate in its briefing or at oral argument what it would have done differently in preparing for trial if the amendment was made earlier in the litigation process. Third, Pinnacle Illinois was on notice of the contents of Pinnacle Florida's proposed amendment almost three months before trial. *See Hargett*, 60 F.3d at 763 (holding that the plaintiff was not prejudiced by the district court's decision to allow the defendant to amend its answer to assert a statute of limitations defense late in the litigation process because the plaintiff "was placed on notice" earlier in the litigation process that the defendant "challenged the timeliness of the action"). Fourth, despite the late amendment, Pinnacle Illinois did not move to delay trial or reopen discovery. Instead, it asked for an opportunity to seek summary judgment on the counterclaim which revealed that it was factually prepared to defend the cancellation counterclaim. In short, the amendment did not unduly prejudice Pinnacle Illinois's ability to prepare its defense. Accordingly, the district court did not abuse its discretion by allowing the amendment. *See Foman*, 371 U.S. at 182.

14

### B.    Pinnacle Florida's Double Burden on Cancellation

Next, Pinnacle Illinois argues that the district court's analysis of the cancellation counterclaim was substantively wrong.[9]  Specifically, Pinnacle Illinois argues that the district court did not view the cancellation counterclaim through the lens of Pinnacle Florida's "double burden" on post-trial review.  First, Pinnacle Illinois asserts that because the jury specifically made findings of distinctiveness and protectability, the district court should have given those findings deference under Rule 50 of the Federal Rules of Civil Procedure when considering Pinnacle Florida's post-trial motion for judgment as a matter of law.  Second, Pinnacle Illinois asserts that because its marks were registered, the district court should have held Pinnacle Florida to its burden to rebut Pinnacle Illinois's marks' presumption of distinctiveness.

### 1.    First Burden: Deference to the Jury's Findings

Under Rule 50, a district court can overturn a jury's finding on an issue if the court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed. R. Civ. P. 50(a)(1).  To overturn a jury's finding, a district court must "examine the entire record in the light most favorable to [the party that prevailed at trial] . . . and ask whether the

_____

[9] We review the district court's decision on Pinnacle Florida's motion for judgment as a matter of law *de novo*, applying the same standard that the district court applied.  *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 782 (11th Cir. 2020).

15

evidence nonetheless points 'so overwhelmingly in favor of' [the movant] that the jury's verdict cannot stand." *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 782 (11th Cir. 2020) (quoting *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995)).

In this case, the district court made clear that it did not use the Rule 50 standard to evaluate the cancellation counterclaim; rather, it applied a preponderance of the evidence standard, considered the evidence anew, and determined that Pinnacle Illinois's marks were not distinctive, and thus not protectable, and cancelled the registrations under § 1119.[10]  The district court appears to have reached this conclusion for two reasons.  First, the district court believed that it could not discern whether the jury made any specific finding that the marks were distinctive.  Second, it noted that the parties "agreed" that the district court would determine the claim.  Pinnacle Illinois contends that both grounds are error.  We agree.

The district court's first reason for not applying the Rule 50 standard—that it was unclear whether the jury made a finding that Pinnacle Illinois's marks were distinctive and thus trademark protectable—is belied by the record.  Although the cancellation counterclaim was not submitted to the jury directly, in considering

---

[10]  As explained more fully below, only distinctive marks—"marks that serve the purpose of identifying the source of . . . goods or services"—are entitled to trademark protection under the Lanham Act.  *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007).

16

Pinnacle Illinois's claims for trademark infringement and unfair competition, the jury made a specific finding that Pinnacle Illinois's marks were distinctive and thus trademark protectable.

As to Pinnacle Illinois's claims for trademark infringement and unfair competition, the jury was instructed:

> To prove its claim, Pinnacle Illinois must prove the following facts by a preponderance of the evidence:
>
> > 1: Pinnacle Illinois owns a trademark that is entitled to protection; and
> >
> > 2: That Pinnacle Florida is using a mark that infringes upon Pinnacle Illinois's trademark.

The jury instructions also twice explained: the concept of trademark protectability, the requirement that a trademark be distinctive, and the spectrum of inherent and acquired distinctiveness. After receiving these instructions, the jury returned a verdict in favor of Pinnacle Illinois on both its trademark infringement and unfair competition claims, necessarily meaning that the jury found that Pinnacle Illinois owned "a trademark that is entitled to protection." The verdict form demonstrates the jury's finding that Pinnacle Illinois's marks were distinctive and thus protectable:

> Do you find by a preponderance of the evidence that:
> . . .
>
> 1. Pinnacle Illinois owns a trademark that is entitled to protection?
>    Answer Yes or No  <u>YES</u>

17

. . .

   2. Pinnacle Illinois's trademark was distinctive prior to the date of
      first use of Pinnacle Florida's trademark, either because Pinnacle
      Illinois's trademark was inherently distinctive or because it had
      acquired distinctiveness?
         Answer Yes or No  <u>YES</u>

Because the record clearly demonstrates that the jury made findings on the distinctiveness and protectability of Pinnacle Illinois's marks, the district court erred in disregarding these findings when it cancelled the marks.

The district court's second reason for not applying the Rule 50 standard—that the parties agreed that the court should decide the issue as a matter of law—is likewise contradicted by the record.  The "agreement" the district court referred to took place at a pre-trial calendar call proceeding.  There, the following exchange occurred:

> THE COURT:  And your position is [the cancellation counterclaim is]
> a legal issue and not for the jury?
>
> PINNACLE ILLINOIS'S COUNSEL:  Right.

According to Pinnacle Illinois, that colloquy did not suggest that the parties agreed to vacate the jury's findings; it only suggested that the parties agreed that the court would decide the proper remedy under § 1119.  As Pinnacle Illinois notes, § 1119 authorizes a court—not a jury—to cancel a registration.  *Royal Palm Props.*, 950 F.3d at 782 ("The Lanham Act gives federal courts the authority to cancel trademarks that the PTO has registered.").  Pinnacle Florida, on the other hand,

18

argues that Pinnacle Illinois agreed that the entire cancellation counterclaim—facts and law—would be decided by the district court.[11]

The district court erred in concluding that Pinnacle Illinois agreed that the jury would have no part in determining the factual issues underlying the cancellation counterclaim. To the contrary, the record supports Pinnacle Illinois's position that it agreed that the court should decide the remedy under § 1119 while deferring to the jury's factual findings. In the "agreement" recounted above, Pinnacle Illinois agreed that the cancellation counterclaim involved a "legal issue" (not a factual one) for the judge to decide. The factual issues underlying the cancellation counterclaim—whether Pinnacle Illinois's marks were distinctive and thus protectable—were given to the jury to determine. After being instructed on these issues, the jury answered "yes" that it found Pinnacle Illinois's marks distinctive and protectable. And in response to Pinnacle Florida's motion for judgment as a matter of law, Pinnacle Illinois included proposed findings of fact, specifically relying on the fact that "[t]he jury returned a verdict specifically stating that the PINNACLE mark is protectible." Because the record clearly

---

[11] Pinnacle Florida also suggests that Pinnacle Illinois waived this argument because "[a]t no time, prior to the filing of its initial appellate brief did [Pinnacle Illinois] argue or object to the District Court deciding the entirety of the Amended Cancellation Counterclaim." We disagree. Pinnacle Illinois is not arguing that the district court should not have decided the cancellation counterclaim. Rather, it is arguing that the district court applied the wrong standard in doing so given the jury's factual findings on the protectability of Pinnacle Illinois's marks. Accordingly, Pinnacle Illinois did not waive this argument.

demonstrates that the parties (and the court) intended to give deference to the jury's findings on distinctiveness and protectability when the court determined the cancellation counterclaim's legal question (the remedy under § 1119), the district court erred in disregarding the jury's findings.

Further, Pinnacle Florida cites no case to support its position that even if Pinnacle Illinois clearly agreed to have the district court redecide the factual issues underlying the cancellation counterclaim, that the district court could do so without giving the jury's findings deference under Rule 50. *See Lindsey v. Am. Cast Iron Pipe Co.*, 810 F.2d 1094, 1098 (11th Cir. 1987) ("[I]t is well-settled that the 'court may not make findings' contrary to or inconsistent with the jury's resolution . . . of that same issue as implicitly reflected in its general verdict . . . ." (quotations omitted)).  We are not persuaded that even if such an agreement existed it would displace the rule that "[o]nce a jury has necessarily or actually decided an issue, the district court may not reconsider it" without giving it proper deference.  *Lindsey*, 810 F.2d at 1098; Fed. R. Civ. P. 50(a)(1); *Royal Palm Props.*, 950 F.3d at 782.

Because the district court did not give the jury's findings on protectability deference, we vacate the district court's order granting Pinnacle Florida's motion for a judgment as a matter of law and remand this case for the district court to "examine the entire record in the light most favorable to [Pinnacle Illinois] . . . and ask whether the evidence nonetheless points 'so overwhelmingly in favor of'

20

[Pinnacle Florida] that the jury's verdict cannot stand." *Royal Palm Props.*, 950 F.3d at 782 (quotation omitted). In other words, the district court should determine "whether a reasonable jury could have decided that [Pinnacle Florida] was *not* entitled to cancellation of the [Pinnacle registrations]." *Id.* "[I]f a reasonable jury could have so concluded" then the district court must uphold the jury's findings and deny Pinnacle Florida's motion for judgment as a matter of law as it relates to its cancellation counterclaim. *Id.*

### 2.  Second Burden: Presumption of Distinctiveness

Pinnacle Illinois also argues that the district court failed to hold Pinnacle Florida to its burden to rebut the presumption that Pinnacle Illinois's marks are inherently distinctive. We begin this section by explaining the importance of a determination of distinctiveness to the district court's consideration of Pinnacle Florida's cancellation counterclaim. We then explain how the district court erred in analyzing Pinnacle Florida's cancellation counterclaim without considering Pinnacle Florida's second burden—the burden to rebut a presumption of inherent distinctiveness.

Distinctiveness is the key to trademark protectability. Only distinctive marks—"marks that serve the purpose of identifying the source of . . . goods or services"—are entitled to trademark protection under the Lanham Act. *Welding Servs., Inc.*, 509 F.3d at 1357. Marks can be inherently distinctive (marks that

21

themselves identify the source of a particular product or service), or marks can acquire distinctiveness (marks that initially might have described a broad class of products, but that over time developed "secondary meaning . . . that links [the mark] to a particular source"). *Royal Palm Props.*, 950 F.3d at 782–83. When a mark is inherently distinctive, no proof of secondary meaning is required to prove protectability. *Id.* But for marks that are not inherently distinctive, proof of secondary meaning is required to obtain protection. *Id.*

"To separate the 'distinct' from the non-'distinct' . . . we have classified marks into four categories, in descending order of strength: (1) 'fanciful' or 'arbitrary,' (2) 'suggestive,' (3) 'descriptive,' and (4) 'generic.'" *Id.* at 783 (quoting *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1559 (11th Cir. 1991)). We consider fanciful, arbitrary, and suggestive marks to be inherently distinctive. *Id.* Descriptive and generic marks, however, are not inherently distinctive. *Id.* "Descriptive marks can become protectible only if they 'acquire' distinctiveness by obtaining a 'secondary meaning,' and generic marks can never become protectible." *Id.* (quoting *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011)).

Federal courts can cancel a registered mark under § 1119 if the challenger to the registration demonstrates: "(1) that it has standing to petition for cancellation because it is likely to be damaged, and (2) that there are valid grounds for

22

discontinuing registration." *Id.* at 782 (quoting *Coach House Rest.*, 934 F.2d at 1557). When, as here, the mark at issue has been registered for less than five years, the "valid grounds for discontinuing registration include any reason for which the registration should have been barred in the first instance." *Id.* (citation and quotation marks omitted). One such ground is that the mark lacks distinctiveness. A determination of distinctiveness, therefore, is key to the district court's determination of whether Pinnacle Illinois's registrations should be cancelled under § 1119.

But in determining whether Pinnacle Illinois's marks are distinctive, the district court must consider the presumptions we give to marks registered with the PTO. When a mark has been registered with the PTO, there is a "rebuttable presumption that the marks are protectable or 'distinctive.'" *Welding Servs. Inc.*, 509 F.3d at 1357 n.3 (quoting 15 U.S.C. § 1057(b)); *see also* 15 U.S.C. § 1115(a). When a mark is registered, a challenger seeking cancellation of the registration must "overcome the presumption of validity by showing—by a preponderance of the evidence—that the mark is *not* distinctive." *Royal Palm Props.*, 950 F.3d at 783. It is also important to emphasize, however, that "trademark holders are never entitled to presumptions of *both* 'inherent' *and* 'acquired' distinctiveness—they get only one or the other." *Id.* "The sort of presumption appropriate depends on whether or not the [PTO] required proof of secondary meaning." *Welding Servs.*

23

*Inc.*, 509 F.3d at 1357 n.3.  When the PTO does not require proof of secondary meaning, the "presumption is that the mark is inherently distinctive," but when the PTO requires proof of secondary meaning, the "presumption is that the mark has acquired distinctiveness by obtaining secondary meaning."  *Royal Palm Props.*, 950 F.3d at 784 (quotation omitted; alterations adopted).

In this case, it is undisputed that the PTO did not require Pinnacle Illinois to provide proof of secondary meaning as part of the registration process for the registrations at issue.  Accordingly, Pinnacle Illinois is entitled to a presumption that its marks are inherently distinctive.  This means that Pinnacle Florida has the "burden of [production and] persuasion," which requires it to "prove invalidity [of the registration] by a preponderance of the evidence."  *Engineered Tax Servs., Inc. v. Scarpello Consulting, Inc.*, 958 F.3d 1323, 1328 n.8 (11th Cir. 2020).

The district court misapplied these standards when it analyzed Pinnacle Florida's cancellation counterclaim.  The district court noted that there is a presumption of distinctiveness for registered marks, but it failed to explain or apply this presumption properly.  First, in its recitation of the presumption, the district court did not distinguish between the presumption for registered marks that required proof of secondary meaning (presumption of acquired distinctiveness) and registered marks that did not require proof of secondary meaning (presumption of inherent distinctiveness).  Second, the district court failed to consider whether

24

Pinnacle Florida rebutted the presumption that Pinnacle Illinois's marks were inherently distinctive.

Accordingly, on remand, the district court should hold Pinnacle Florida to its "double burden" to (1) demonstrate that "no reasonable jury" could have found Pinnacle Illinois's marks to be distinctive, and (2) rebut the presumption that Pinnacle Illinois's marks are inherently distinctive.

### C.    Laches Defense

Pinnacle Illinois argues the district court erred in finding that its claims for money damages for trademark infringement and unfair competition under the Lanham Act were barred by the doctrine of laches.  "The equitable defense of estoppel by laches may be applied to bar . . . Lanham Act [claims]."  *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997). "Though the doctrine is an equitable doctrine that should be applied flexibly, a defendant must demonstrate the presence of three elements in order to successfully assert laches as a defense: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted."  *Id.*

In trademark infringement cases, because the Lanham Act does not contain a statute of limitations, we consider the "the [limitations] period for analogous state law claims as the touchstone for laches."  *Id.*  The analogous Florida limitations

period for this type of action is four years. *See* Fla. Stat. § 95.11(3); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir. 1986).

"When the district court has weighed the proper factors in determining whether a defendant has proven the elements of a laches defense, we review the district court's decision for abuse of discretion." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008). And we review the district court's factual findings for clear error. *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 n.12 (11th Cir. 1984). A factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246 (11th Cir. 2002) (quoting *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535 (11th Cir. 1985)).

The district court concluded that Pinnacle Florida established each element of laches by a preponderance of the evidence and accordingly barred Pinnacle Illinois's claims for trademark infringement and unfair competition. We will address each element in turn.

### 1. Delay

We calculate delay from the moment "the plaintiff knows or should know [it] has a provable claim for infringement." *Kason*, 120 F.3d at 1206. The parties dispute when Pinnacle Illinois knew or should have known of its infringement and

unfair competition claims against Pinnacle Florida.[12]  Lanham Act trademark

infringement claims and unfair competition claims both center on the likelihood of

confusion between the two marks.  15 U.S.C. §§ 1114, 1125(a); *Savannah Coll. of*

*Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1279 (11th Cir. 2020)

(explaining that plaintiff had to prove likelihood of confusion to prove claims for

trademark infringement and unfair competition).  Thus, the relevant question here

is when Pinnacle Illinois knew or should have known that there was a likelihood of

confusion between the two marks.

Pinnacle Illinois contends that we should calculate the delay from February

4, 2016—the date on which Advertising Age magazine mistakenly linked Pinnacle

Florida's website to an article about Pinnacle Illinois for the second time.  Pinnacle

Florida, however, contends that we should calculate delay from January 2014[13]—

the date on which Pinnacle Illinois pitched a potential client, Central Florida

Honda, who asked if Pinnacle Illinois was affiliated with Pinnacle Florida.  After

reviewing the evidence, the district court agreed with Pinnacle Florida and found

that Pinnacle Illinois knew or should have known there was a likelihood of

---

[12]  The parties agree that we stop the delay calculation on April 4, 2019—the day Pinnacle Illinois filed its initial infringement lawsuit in Illinois.

[13]  As we previously explained, the record does not definitively establish whether the Central Florida Honda pitch meeting occurred in late 2013 or early 2014.  The exact date is irrelevant to our analysis because even if the meeting occurred in January 2014, Pinnacle Illinois waited over four years before bringing suit, which exceeds the four-year Florida statute of limitations—the touchstone of our laches analysis.

confusion between the two marks as of January 2014, which was over four years before Pinnacle Illinois initially filed suit. The district court concluded that Pinnacle Florida had demonstrated the delay element of laches because Pinnacle Illinois sued after the Florida four-year statute of limitations—the touchstone of laches—had passed.

The district court's finding that Pinnacle Illinois knew or should have known of its claim as of January 2014 was not clearly erroneous. The district court relied on three pieces of evidence in making its determination. First, the district court relied on an interrogatory from the Illinois litigation in which Pinnacle Florida asked Pinnacle Illinois when and how Pinnacle Illinois became aware of Pinnacle Florida. Pinnacle Illinois responded that:

> Michael Magnusson of Pinnacle (IL) first became aware of Pinnacle (FL) in or around late 2013. He became aware of Pinnacle [(FL)] when pitching to the Central Florida Honda Dealers Association, when personnel related to that group asked whether the two were affiliated because they did not wish to do business with Pinnacle (FL). At that time, Mr. Magnusson assured the Central Florida Honda Dealers Association that the two were not affiliated.

Second, the district court relied on an interrogatory from the current litigation where Pinnacle Florida asked Pinnacle Illinois to "[d]escribe in detail every occurrence [when the parties] pitched or marketed to the same potential client and the outcome of same." Pinnacle Illinois replied that "it [was] aware that Pinnacle (IL) and Pinnacle (FL) both pitched their services to the Central Florida

28

Honda Dealers Association in or around late 2013." The district court said this evidence "implies that Pinnacle Illinois was aware of Pinnacle Florida in late 2013 and that Pinnacle Florida offered similar services as Pinnacle Illinois."[14]

Third, the district court relied on a withdrawn request for admission from the current litigation. Pinnacle Illinois admitted that it was aware of Pinnacle Florida's "use of the name 'Pinnacle Advertising and Marketing Group, LLC' at least as early as 2013." Pinnacle Illinois moved to withdraw this admission, and the magistrate judge granted its request, which means it is not conclusive evidence of the fact. Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."). The district court, however, considered it probative for the purposes of analyzing Pinnacle Illinois's delay in asserting its claims. In short, the district court found that Pinnacle Illinois knew of Pinnacle Florida in January 2014 and, at that time, it also knew that Pinnacle Florida was operating "a competing advertising business, utilizing the same name, in the same geographic area that Pinnacle Illinois had customers."

---

[14] Pinnacle Illinois replies that this evidence is contradicted by Pinnacle Florida's CEO's testimony that Pinnacle Florida never pitched its services to Central Florida Honda. Although Pinnacle Florida's CEO did testify to that effect, the evidence that the district court relied on is still probative of the fact that Pinnacle Illinois had some awareness that Pinnacle Florida was a competing advertising company operating in the same geographic area as Pinnacle Illinois, that Pinnacle Illinois's potential customers required clarification about the relationship between the two companies, and that Pinnacle Illinois's understanding was that it and Pinnacle Florida were competing for the same clients.

Pinnacle Illinois argues that the district court's findings as to what occurred at the pitch meeting were clearly erroneous because Magnusson's trial testimony about the Central Florida Honda pitch meeting diverges from his earlier recollection of the meeting. The following exchange occurred at trial:

Q: So is this the first time that you heard of the defendant?

A: So the answer is "no." I heard about them earlier, but I didn't associate it until we started, you know, discovering more.
And essentially what happened was we were presenting to the Central Florida Honda Dealers Association. And we were pitching that business, and when we were pitching that business, there was a conversation in the room among the dealers, and somebody said, just something that we overheard, or I overheard, you know, is that – is that Pinnacle? . . . And I don't know what he was relating to, I didn't understand really what they were talking about, but after discovering more, then I associated the two.
So I legitimately heard about them in 2014.

Q: But in 2014, you didn't know who that Pinnacle that was referred to by the Central Florida Honda, right?

A: No, I didn't know who it was.

Based on that testimony, Pinnacle Illinois argues that there is no proof that the "other Pinnacle" referenced in the Central Florida Honda pitch meeting was Pinnacle Florida. We disagree. The district court did not clearly err in crediting Magnusson's earlier testimony—demonstrating a clear understanding that Pinnacle Florida was discussed at the pitch meeting—over his later testimony that only some anonymous "other Pinnacle" was mentioned at the Central Florida Honda pitch meeting.

30

Pinnacle Illinois also argues that the meeting, even as the district court viewed it, did not give Pinnacle Illinois notice of a potential infringement claim. It argues that delay should instead be calculated from the second Advertising Age mistake because only then did Pinnacle Illinois discover that Pinnacle Florida had "expanded its use of the PINNACLE mark to include the automotive market, where it would directly compete with [Pinnacle Illinois]." In other words, Pinnacle Illinois argues that Pinnacle Florida progressively encroached on Pinnacle Illinois's market over several years and we should not start the delay calculation until the second Advertising Age mistake because only then was Pinnacle Florida infringing on Pinnacle Illinois's marks.

To be sure, the doctrine of progressive encroachment is relevant to determining when delay begins.[15] Under the doctrine, when "a defendant begins use of a trademark . . . in the market" and only later "directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the plaintiff," we calculate delay from the later period because only then did the plaintiff "know [it] ha[d] a provable claim for infringement." *Kason*, 120 F.3d at 1205–06.

---

[15] In *Kason*, we noted that courts "typically discuss encroachment as an excuse for delay," but we explained that "the doctrine significantly overlaps the court's inquiry into when delay begins." 120 F.3d at 1206.

The district court rejected Pinnacle Illinois's argument that the doctrine of progressive encroachment affected its delay calculation in this case.  As the district court explained, after the Central Florida Honda pitch meeting, Pinnacle Illinois was on notice that (1) another entity was using the name "Pinnacle" in the same advertising and marketing industry, (2) Pinnacle Illinois's potential client in the automotive sector was aware of the entity, (3) the entity was operating in a geographic location in which Pinnacle Illinois sought customers, and (4) at least one instance of actual confusion had occurred.  Accordingly, the district court found that Pinnacle Illinois was on notice of a potential infringement claim in January 2014.  On our view of the entire record, the district court's finding is supported by the evidence for the reasons the district court explained.  Accordingly, the district court did not clearly err because we are not left with the definite and firm conviction that the district court committed a mistake when it calculated Pinnacle Illinois's delay from January 2014.  *See Johnson & Johnson*, 299 F.3d at 1246 (quotation omitted).

### 2. Excuse

In determining whether the second element of laches is met, courts consider whether the plaintiff had an adequate excuse for waiting to bring suit.  The excuse requirement ensures that "[a] trademark owner cannot simply wait without explanation to see how successful the defendant's business will be and then [sue]

32

to take away [the] good will developed by defendant in the interim."  6 *McCarthy on Trademarks and Unfair Competition* § 31:14 (5th ed. 2021).

Courts excuse delay when, for example, a trademark owner delays in suing because it is attempting to resolve the dispute through settlement negotiations. *See, e.g.*, *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 585 (6th Cir. 2015) (explaining that negotiations to resolve the dispute do not count for the running of a laches defense); *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 932 (7th Cir. 1984) ("It would disserve the strong policy in favor of nonjudicial dispute resolution if defendant successfully could assert that the three-and-one-half year period of settlement attempts contributes to the establishment of laches."); *Siegerist v. Blaw-Knox Co.*, 414 F.2d 375, 381 (8th Cir. 1969) (excusing delay because "the parties attempted to engage in conciliatory negotiations rather than rush headlong toward litigation").[16]

The district court determined that Pinnacle Illinois had no excuse for delaying four years to sue to enforce its marks.  It found that Pinnacle Illinois failed to communicate with Pinnacle Florida about the infringement until it filed

---

[16]  Although we did not specifically ground our analysis under the second laches element, we similarly held in *Citibank, N.A. v. Citibanc Group, Inc.* that the laches defense failed because the plaintiff wrote letters repeatedly warning the defendant that it "regarded the use of Citibanc as an infringement of [its] rights," but that the defendant expanded its use of the mark anyway. 724 F.2d 1540, 1546 (11th Cir. 1984).  Because the "[d]efendants ha[d] not relied on the delay of plaintiffs in expanding their use of the mark[,]" we found that that the defendants had not established the defense of laches.  *Id.* at 1547.

the Illinois lawsuit. The district court pointed out that Magnusson was "horrified" both times Advertising Age mistakenly included Pinnacle Florida's website in its article about Pinnacle Illinois, but Magnusson "did not take even the minimal step of contacting Pinnacle Florida to begin discussing the potential infringement."

Pinnacle Illinois argues it should be excused for its delay because of the "progressive encroachment" argument discussed above. While some courts do consider progressive encroachment under the excuse prong of laches, we consider it in calculating the initial delay. *Kason*, 120 F.3d at 1206 (analyzing progressive encroachment under the delay element of laches). In any event, as explained above, we reject Pinnacle Illinois's argument that it did not know or should not have known of a potential infringement claim during the Central Florida Honda pitch meeting. Accordingly, Pinnacle Illinois has failed to show that the district court clearly erred when it found that Pinnacle Illinois had no excuse for its delay in enforcing its marks.

### 3. Undue Prejudice

Pinnacle Illinois's final argument is that Pinnacle Florida was not prejudiced by any delay. "[M]ere delay, without resulting injury to defendant, is not sufficient to prevent relief for infringement." 6 *McCarthy on Trademarks and Unfair Competition* § 31:12 (5th ed. 2021). Courts have previously recognized two categories of prejudice caused by a delay in bringing a trademark infringement

34

suit—evidentiary prejudice and economic prejudice. *Id.* (collecting cases) ("Evidentiary prejudice encompasses such things as lost, stale or degraded evidence or witnesses whose memories have faded or who have died. Economic or expectation-based prejudice encompasses actions made by the defendant that it would not have taken or consequences it would not have experienced had the plaintiff brought suit promptly.").

In this case, Pinnacle Florida asserts that it suffered economic prejudice. The district court concluded that Pinnacle Florida established that it had been unduly prejudiced by Pinnacle Illinois's delay because Pinnacle Florida showed that it "expended significant time and money developing its business (under the Pinnacle name)." In addition to growing its business and expanding its clientele during the time between the Central Florida Honda pitch meeting and when Pinnacle Illinois sued to enforce its marks, Pinnacle Florida's CEO Pete Gary testified at trial that he has spent "close to $2 million" developing Pinnacle Florida and its brand. Gary explained that the money was spent on sending representatives to trade shows to pitch Pinnacle Florida to potential clients, creating publications and booklets with the Pinnacle image and address, and supporting charity events under the Pinnacle name.

Pinnacle Illinois argues that the district court clearly erred in finding that these expenditures were sufficient to show prejudice because Pinnacle Florida only

presented evidence of time and money spent promoting its company, rather than evidence of time and money promoting the Pinnacle mark.  We note that our sister circuits are split on the showing required to satisfy the prejudice element of laches under the economic prejudice category.

The Ninth Circuit has adopted a stricter approach and requires a showing of prejudice to be "based on an investment in the [trademark] as the identity of the business in the minds of the public[,]" which is different than "mere[] . . . expenditures in promoting the infring[ing] name[.]"  *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 991–92 (9th Cir. 2009).  In *Internet Specialties*, the Ninth Circuit held that no prejudice was shown merely by the growth of the defendant's business and customer base during the delay when the defendant presented no evidence of its investment in the public's awareness of the trademarked brand.  *Id.*

Other circuits take a broader view of prejudice and have held that any showing of economic prejudice related to the business because of the delay is sufficient.  *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 322 (6th Cir. 2001) (holding that increased potential liability for damages by itself was sufficient to show prejudice); *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999) (holding that substantial

investments in equipment used to produce the infringing product were sufficient to show prejudice).

In this case, we need not take a position on this circuit split, however, because even under the Ninth Circuit's strict approach, the "business" and the "mark" in this case are one and the same—the investments described by Pinnacle Florida's CEO at trial are promoting the business generally and associating the business with the "Pinnacle" name in the minds of relevant consumers. Accordingly, it is impossible to distinguish between investments in promoting the mark versus investments into promoting the business generally.

If Pinnacle Florida had known of Pinnacle Illinois's infringement and unfair competition claims sooner, it could have redirected its resources into promoting its business and brand under a different name during the four years it continued to promote the Pinnacle mark after Pinnacle Illinois should have known of its infringement and unfair competition claims. Accordingly, Pinnacle Illinois failed to show the district court clearly erred in finding that Pinnacle Florida was prejudiced by Pinnacle Illinois's over-four-year delay in bringing suit.

*    *    *

Pinnacle Illinois has failed to show that the district court committed clear error when it found that each element of the defense of laches was met. Accordingly, the district court did not abuse its discretion when it determined that

37

Pinnacle Illinois was barred from bringing its trademark infringement and unfair competition claims for monetary damages.

### D.     Public Interest in Avoiding Confusion: Injunctive Relief

Even though we affirm the district court's conclusion that the doctrine of laches bars Pinnacle Illinois's claims for monetary damages for trademark infringement and unfair competition, we remand this case for the district court to consider Pinnacle Illinois's request for injunctive relief to protect the public's interest in avoiding confusion.  As we explained in *Kason*, even if laches bars a claim for money damages, "if the likelihood of confusion is inevitable, or so strong as to outweigh the effect of the plaintiff's delay in bringing a suit, a court may in its discretion grant injunctive relief, even in cases where a suit for damages is appropriately barred."  *Kason*, 120 F.3d at 1207; *see id.* ("Because of the public interest in preventing the deception of consumers, delay by the trademark owner will not ordinarily disable it from obtaining an injunction if there is strong evidence of likely or actual confusion." (alteration adopted) (quoting Restatement (Third) of Unfair Competition § 31, cmt. e (1995))).

Although Pinnacle Illinois sought both monetary and injunctive relief for its trademark infringement and unfair competition claims, the district court did not address whether Pinnacle Illinois is entitled to injunctive relief to protect the public's interest in avoiding confusion.  Accordingly, on remand, the district court

38

must "weigh the equities of the case and the strength of [Pinnacle Illinois's] case" to determine whether injunctive relief is appropriate. *Kason*, 120 F.3d at 1207 (explaining that because the issue of whether to grant an injunction after a trademark claim for money damages is barred by laches will "require a careful, fact-intensive consideration," so it is best left "for the district court and its informed discretion on remand" (quoting *SunAmerica Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325 (8th Cir. 1996))).

### III.    Conclusion

For the reasons explained above, the judgment of the district court is VACATED in part, AFFIRMED in part, and the case is REMANDED for further consideration consistent with this opinion.

**VACATED IN PART, AFFIRMED IN PART, and REMANDED.**