[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11210
Non-Argument Calendar
_____

D.C. Docket No. 6:16-cv-02001-GAP-GJK

SUPERIOR CONSULTING SERVICES, INC.,
a Florida corporation
d.b.a. Your Future Health
d.b.a. YFH,

                                        Plaintiff - Appellant,

versus

SHAKLEE CORPORATION,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 17, 2017)

Before HULL, WILSON, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Superior Consulting Services, Inc., appeals the district court's denial of its motion for a preliminary injunction against Defendant Shaklee Corporation to halt Shaklee's alleged trademark infringement of Superior's mark "HealthPrint."  After a careful review of the record, and for the reasons that follow, we affirm.

## I.

Superior owns and operates two fictitious business entities, Your Future Health and YFH, through which it offers a service called "HealthPrint."  Eleanor Cullen, a registered nurse, developed HealthPrint and founded YFH.  Ms. Cullen declared that Healthprint

> centers around the principle that "normal" blood test scores are not good enough to assist person with the early identification of potentially serious health problems . . . A Healthprint is customized to a client's unique biochemistry, and it includes a detailed nutrition analysis that specifies certain lifestyle changes, foods and supplements clients should consume to achieve his or her optimum health. Healthprint also identifies additional laboratory tests that clients need to improve and optimize their health.

Superior offers an assortment of HealthPrint packages testing various blood panels, the most basic of which costs $474.00 and most comprehensive costs $1,462.00.  Additional tests may be ordered, costing anywhere from $45.00 to $552.00.  Accompanying the blood-test order form is a lifestyle survey, including questions regarding stress levels, alcohol consumption, sleeping habits, and

medical history.  Upon producing the "HealthPrint" with results to the customer, Superior then recommends certain supplements, but it does not sell them.

Superior claims that the HealthPrint refers to the "total client profile," which does not require the client to undergo a blood test.  Clients can choose only to fill out a comprehensive survey of questions called the "Master Symptom Tracker" from which Superior produces a "HealthPrint" dictating "certain changes that could benefit them through their diet, exercise, weight management programs, water intake, and supplement suggestions."

Superior owns two trademarks for the text "HealthPrint," both of which appear on the Principle Register.  The application for the first trademark (registration number 2646571), which was approved in 2002, listed the purpose as "Nutritional supplements for general health maintenance," "Printed instructional and teaching material in the field of health care," and "consulting services in the field of health care."  Superior filed a Section 15 declaration of incontestability for this mark in 2008.

The application for the second trademark (registration number 2928465), which was approved in 2005, listed the purpose as "blood testing services; consultation in the fields of food nutrition, diet and health."  Superior filed a Section 15 declaration of incontestability for this mark in 2011.

3

The prosecution histories for both trademark applications include various submissions of brochures, one of which states that "**HealthPrint** includes a special group of blood tests that are rarely ordered because they are expensive. . . . **YFH** believes that these tests as well as traditional tests must be done to properly balance your body systems and to prevent many diseases."  ECF No. 21-2 at 2 (emphasis in original).  That brochure also explains that "**HealthPrint** requires a blood draw at one of thousands of participating collection sites."  *Id.* (emphasis in original). Another submission explains that lab ranges are customized "by your age, sex, blood type, height, and other blood test results—one range does not fit all."

Shaklee is a manufacturer and distributor of natural nutrition supplements as well as weight-management, beauty, and household products.  It does not offer blood tests.  Since August 6, 2016, Shaklee has offered a free, online "Healthprint" questionnaire that asks various lifestyle questions, including questions regarding age, sleep, stress levels, exercise regime, memory, and diet.  Once a customer completes the survey, a report is automatically generated based on algorithms.  The report also includes recommendations for certain vitamin supplements or other products; for example, if customers indicate that they do not regularly eat salmon, Shaklee will recommend they buy a Shaklee Omega-3 supplement.  Upon making a purchase, customers are assigned to a distributor for further support and

4

assistance.    Shaklee claims that it sells most of its supplements through its distributor network.

Superior became a distributor for Shaklee in 1978.  Although Superior's HealthPrint is sold directly to the public online, it is also sold through referrals from Shaklee's distributors to Shaklee clients.  For example, in the first ten months of 2016, Shaklee's clients accounted for 31 percent of Superior's HealthPrint sales. In exchange for these referrals, Superior recommends Shaklee supplements to clients when appropriate.

Shaklee applied for a trademark for "HEALTHPRINT" on June 8, 2016. The application states that HEALTHPRINT's purpose is "life quality assessment for individuals; and providing information in the fields of personal development and improvement of quality of life."  A conflict was found regarding the use of the word "health" in the mark, so the description was changed and approved for "Providing information in the field of personal development, namely, personal improvement, and specifically excluding healthcare information."

## II.

On November 1, 2016, Superior filed a Complaint for injunctive relief and monetary damages alleging trademark infringement under the Lanham Act, 15

5

U.S.C. § 1114, *et seq.*[1]  On December 20, 2016, Superior filed a Motion for a Preliminary Injunction.  The district court held oral arguments and entered an order on February 21, 2017, denying the preliminary injunction.  Superior now appeals.

## III.

We review an order denying a motion for a preliminary injunction for an abuse of discretion.  *Forsyth Cty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011).  We review findings of fact for clear error and legal conclusions de novo.  *Id.*  "This scope of review will lead to reversal only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect."  *Id.* (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005)).

A preliminary injunction is an "extraordinary and drastic remedy" and should not be granted unless the movant clearly satisfies its burden of persuasion as to four prerequisites: (1) a substantial likelihood of success on the merits of its claim at trial; (2) a substantial threat of irreparable harm to the movant if injunctive relief is denied; (3) the injury to the movant outweighs the potential harm that an injunction may cause the defendant; and (4) an injunction will not disserve the

---

[1] On November 28, 2016, Superior filed an opposition to Shaklee's application with the United States Patent and Trademark Officer ("USPTO"), triggering an administrative scheduling order to resolve the opposition.  However, the parties agreed to stay the USPTO proceeding until 20 days after resolution of this civil action.

public interest.  *Id.* (quoting *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)); *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002).  Because we find that Superior cannot establish the first element, we need not address the remaining three.

### A. Substantial Likelihood of Success on the Merits

The Lanham Act provides that infringement occurs when the defendant uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" that is "likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1).  To prevail in an infringement suit, the plaintiff must demonstrate that (1) its mark has priority, is valid, and protectable and (2) the defendant's mark is likely to cause consumer confusion.  *Frehling Enter., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).  Because Superior's mark is "incontestable," its validity is conclusively presumed.  *See Dieter v. B & H Indus. of S.W. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989).

As a result, we need determine only whether Shaklee's use of the mark is likely to cause consumer confusion by considering the following seven factors: (1) the type of mark, (2) the similarity of marks, (3) the similarity of the products the marks represent, (4) the similarity of the parties' retail outlets (trade channels) and customers, (5) the similarity of advertising media, (6) the defendant's intent, and

(7) actual confusion. *Frehling*, 192 F.3d at 1330. The type of mark and actual confusion are the most important factors. *Id.* This Court reviews for clear error the findings as to each individual factor as well as the overall conclusion regarding the likelihood of confusion. *Id.*

The district court balanced the factors and concluded that Superior could not establish a likelihood of consumer confusion. Superior does not challenge the district court's findings on factor two—that the marks are "indisputably similar"—and factor five—that both parties "use word-of-mouth, their websites, television, and various social media networks to market their respective Healthprints."[2] Accordingly, our review is limited to the remaining five factors.

*1. Type of Mark*

Trademark protection is afforded to distinctive marks only. Stronger marks receive greater protection; conversely, weaker marks receive less protection. *Frehling*, 192 F.3d at 1335. Marks are classified under four categories, each increasing in strength: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary. *Id.* Generic marks refer to a "class of which an individual service is a member (e.g., 'liquor store' used in connection with the sale of liquor)," and are the weakest and thus not entitled to any protection. *Id.* Descriptive marks refer to a

---

[2] The district court added that "[w]hile the types of media used by the parties overlap, the only evidence provided by Superior that the *audience* overlaps is the word-of-mouth advertising though Shaklee's distributor network. Nevertheless, the Court finds that this factor weighs slightly in favor of a likelihood of confusion." (emphasis in original).

characteristic or quality of a product or service, such as a "vision center" denoting a store that sells glasses. *Id.* Suggestive marks tap into the consumer's imagination to make the connection between a characteristic of the goods or services and the mark, such as "penguin" for a refrigerator. *Id.* Finally, arbitrary marks, which are the strongest of the four types, bear no relationship to the product. *Id.* at 1335-36.

A mark's registration with the USPTO creates a rebuttable presumption of distinctiveness. 15 U.S.C. § 1057(b). If the USPTO does not require evidence of secondary meaning, then the presumption is that the mark is "inherently distinctive." Suggestive and arbitrary marks are "inherently distinctive," so they require no proof of secondary meaning. *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1523 (11th Cir. 1991). Descriptive marks may become distinctive only if they acquire secondary meaning. *Dieter*, 880 F.2d at 328.

Moreover, when a mark is deemed "incontestable," "it is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Dieter*, 880 F.2d at 329. A mark is "incontestable" when it has been registered with the USPTO for five years, its holder has filed the affidavit required by 15 U.S.C. § 1065(3), and the USPTO has declared the mark "incontestable." *Frehling*, 192 F.3d at 1336.

9

Here, the district court ultimately concluded that "Superior's marks are likely somewhat strong, lying somewhere between suggestive and descriptive." This was clear error.

Superior registered both of its marks with the USPTO after the required time and acquired the "incontestable" status for both. By definition then, Superior's mark is, at a minimum, descriptive and a "relatively strong mark." *See Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3 931, 939 (11th Cir. 2012). Furthermore, when Superior registered its marks, the USPTO did not require any proof of secondary meaning. As a result, the district court correctly found that Superior's mark is entitled to the rebuttable presumption that it is "inherently distinctive" and thus at least suggestive and entitled to strong trademark protection.

The district court clearly erred, however, in concluding that Shaklee rebutted that presumption with its evidence of third-party usage. Undoubtedly, third-party use is an important factor in determining distinctiveness and strength. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974-75 (11th Cir. 1983). "Where there is a lack of third-party use, the mark's strength is enhanced, as it is more distinctive, and therefore more easily recognized by consumers." *Frehling*, 192 F.3d at 1336 (citing to *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*,

10

651 F.2d 311, 313 (5th Cir. July 20, 1981) (finding error where district court failed to factor in third-party usage)).

Although the number of third parties using the name is important, there is no magic number of third-party users that weaken a mark. Rather, we assess the impact of third-party use by considering the "the entire name a third party uses, as well as the kind of business in which the user is engaged." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1257 (quoting *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1165 (11th Cir. 1982)) (internal quotation marks omitted).

In *Florida International University*, for example, we held that twelve other universities' uses of "Florida" and "University" in their names diminished the strength of the mark "Florida International University," particularly where they were all higher education institutions and all in the same geographic region—Florida—targeting the same customers. *Id.* at 1257-58.

Here, Shaklee presented nine other instances in which the term "Healthprint" has been used around the country, but unlike in *Florida International University*, none is located within the same geographical area as Superior, and none involves the same kind of business as Superior's. *See* ECF No. 43 at 10-11 (listing "Healthprint" as used by the State of Utah for a health-care policy; by a San Franciscan gynecologist for a patient, medical-records online access application;

11

by a Nebraskan holistic massage parlor; by a Texan wholesale school-supply company; by commercial printers in Texas and Pennsylvania; by a medical 3D printing company; and as a phrase used in a medical study). None of these instances Shaklee cited occupies the same commercial field as Superior such that they would weaken the distinctiveness of Superior's mark. Shaklee also cited a USPTO registration of "HEALTHPRINT" for patient medical information, but the fact that both this mark and Superior's "Healthprint" mark were approved as trademarks indicates that each was deemed distinctive and not confusingly similar.

Shaklee also provided numerous instances in which the words "health" and "print" are used in a variety of contexts and combinations, including "HEALTH FOOTPRINT" for information concerning nutrition, illness, and wellness; "BLUEPRINTS FOR HEALTH" for dietary supplements; and other marks related to supplements such as VITAPRINT, HEALTH PLUS, and NUTRITION FINGERPRINT. *See* ECF Nos. 43, 43-12, 43-13, 43-14. These examples occupy the same general field of health as Superior. But because the "health" category is infinite, these marks diminish the strength of Superior's HealthPrint mark only slightly, particularly because these products are not located in the same geographic region as Superior's. Thus, Shaklee failed to present sufficient evidence to rebut the presumption that Superior's mark is "inherently distinctive."

12

Shaklee argued below that "it would be exceptionally difficult to have a truly 'strong' mark composed of the common English words HEALTH and PRINT as the dominant features of the mark to describe a health-related product or service." *See* ECF No. 43 at 12. But taking Shaklee's argument to its logical conclusion would essentially prevent any entity from ever obtaining trademark protection or succeeding in a suit for infringement if it contains words like "health" and "print."[3]

Accordingly, while the district court appropriately considered evidence of third-party use, it clearly erred in finding that Superior's mark was anything less than suggestive. *Similarity of Products the Marks Represent*

"This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling*, 192 F.3d at 1338 (citing *E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir.1985)). For example, in *Frehling*, we explained that a reasonable consumer could possibly believe that the same source produced both parties' products because they were both furniture pieces that were designed for the home and had the capability to hold electronic equipment. That

---

[3] This argument is even more troubling considering that Shaklee has also filed a trademark application for its mark "HEALTHPRINT," which it has stayed pending resolution of this action.

13

each product was made of different types of materials (one out of metal and tempered glass and the other out of various woods, marble and stone) and were sold at vastly different prices was not dispositive. *Frehling*, 192 F.3d at 1338. Though we described the question as close call, we nonetheless determined that the district court applied too much weight in the defendant's favor. *Id.*; *see also E. Remy Martin*, 756 F.2d at 1530 (finding that a reasonable consumer could have concluded that the producer of wine could also produce brandy).

Here, the district court properly found that consumers are not likely to believe that Superior is producing both comprehensive blood-testing services and a free questionnaire. Superior has stated, and the evidence depicting its website clearly indicates, that its "primary objective is the early detection of disease, through performing certain laboratory tests, including blood tests, for consumers." Its list of products indicates that "HealthPrint" is associated with some type of blood testing, offering services such as the "Basic HealthPrint" and "HealthPrint Platinum." The lifestyle questions appear to be secondary to the blood testing.

Although Superior provided evidence that blood-testing is not required for a customer to obtain a HealthPrint, the district court correctly noted that the prosecution history files for Superior's trademark applications explicitly state that the "HealthPrint **requires** a blood draw." (Emphasis added). Superior also provided a copy of the full survey it offers, which it alleges is similar to Shaklee's

14

questionnaire, and explained that its "HealthPrint" refers to the "combination of laboratory tests and a series of written questions." However, Superior's survey is titled a "Master Symptom Tracker," and the instructions say "Please make a copy of this form and fill it out each time you order your HealthPrint." This seems to indicate that the HealthPrint is separate and apart from this survey of questions. Accordingly, the district court did not clearly err in finding that this factor weighs in Shaklee's favor.

### 3. Similarity of Parties' Retail Outlets and Customers

The likelihood of confusion is greater where the plaintiff and defendant use similar retail outlets and advertising media and target similar customers. *Frehling*, 192 F.3d at 1339. Direct competition is not required to show likelihood of confusion. *Id.* Similarly, the outlets and customer bases need not be identical but rather an overlap should be present. *Id.* Customer bases may overlap despite significant price differences in products: "[I]t may be difficult to draw a line between those consumers who shop at 'class' retailers and those who shop at 'mass' retailers because of those consumers who 'cross-shop' and frequent both types of retailers." *Id.* (internal citation omitted). In *Frehling*, we held that the district court clearly erred in weighing this factor too heavily in favor of the defendant where it based its finding primarily on the relative affluence on each party's customer base. *Id.*

15

The parties here clearly share a customer base and retail outlets, as Shaklee distributors often refer their clients to Superior, who in turn, recommends Shaklee supplements when appropriate. In the first ten months of 2016, Shaklee clients made up 31 percent of Superior's clientele, and from 2001 to present, over 1,100 Shaklee clients have purchased a HealthPrint from Superior.

The district court improperly credited Shaklee's argument that any overlap should be disregarded because the parties cater to different kinds of people, one group who is willing to spend hundreds of dollars on blood tests and the other who just wants something for free. But as the evidence shows, the parties clearly have customers who have bought products from both parties, suggesting that the two companies do, in fact, target similar customers. *See Frehling*, 192 F.3d at 1339.

Despite this error, we cannot say that the district court clearly erred in finding this factor "neutral." While overlap of customers and retail outlets does exist, the majority of Superior's customers have no affiliation with Shaklee, so we cannot say that this factor weighs heavily either way.

*6. Defendant's Intent*

"If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." *Frehling*, 192 F.3d at 1340 (citing *John H. Harland Co.*, 711 F.2d at 977). In

16

examining this factor, the district court had to determine whether Shaklee "had a conscious intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 (11th Cir. 2007).  In *Frehling*, for example, we found evidence that the defendant was "intentionally blind" in adopting its mark where it had notice of the significant similarities in the marks after the USPTO denied its application to register the mark; it also manifested improper intent when it deliberately included the plaintiff's mark in its own telephone number.  *Frehling*, 192 F.3d at 1340.

Here, given its decades-long relationship with Superior, Shaklee undeniably knew of Superior's Healthprint mark and its success.  Shaklee also had prior notice of a conflict with Superior's mark when the USPTO required Shaklee to remove "health" from the description in its trademark application.  Nevertheless, we cannot say the district court clearly erred in finding that this factor weighed in favor of Shaklee.

Superior points to Shaklee's use of a green fingerprint in its mark as evidence of Shaklee's ill intent.  And indeed, the logos are similar.  But Shaklee produced evidence that it conducted consumer research to pick the logo from a

variety of choices, including some that were significantly less similar.[4]    That evidence tends to negate a finding of ill intent.

Superior further claims that it gave Shaklee confidential, proprietary information during a conference call about HealthPrint that Shaklee later employed to develop its own Healthprint.  Superior offered no evidence about the content of the call other than the initial email correspondence from Shaklee's legal counsel requesting information about Superior and its services.  *See* ECF No. 20-1.

Shaklee contended that this conference call had nothing to do with Superior's HealthPrint and produced an email chain evidencing that Shaklee actually contacted Superior because it was concerned that Superior, through Cullen, was practicing medicine without a license.  Shaklee also produced evidence indicating the selection process of names for its questionnaire through consumer testing.  Moreover, this call took place in 2005, and Shaklee did not develop its Healthprint until eleven years later—in 2016.  For these reasons, we find no clear error in the district court's determination that this factor weighs in favor of Shaklee.

---

[4] The logo choices included a fingerprint in the shape of a fingerprint, a fingerprint in the shape of an apple, a partial fingerprint, a stylized form of the letters "HP" against a circle with a fingerprint background design, and a fingerprint in the shape of a leaf.

18

*7. Actual Confusion*

"It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion.  However, such evidence is not a prerequisite, and thus it is up to individual courts to assess this factor in light of the particular facts of each case."  *Frehling*, 192 F.3d at 1341 (internal citations omitted).  The *type* of person confused is most important, rather than the number confused:

> Perhaps as important as, and helping to explain the various interpretations of the relevance of, the number of instances of confusion are the kinds of persons confused and degree of confusion. Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, while confusion of actual customers of a business is worthy of substantial weight.

*Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982) (internal citations omitted); *Frehling*, 192 F.3d at 1341 (where one professional buyer acquainted with mark was confused, this raised an inference of actual confusion but was not sufficiently dispositive so as to favor either party).

Superior submitted seven affidavits in support of its contention that Shaklee's mark has caused actual confusion.  Four were from Superior customers who stated they were confused when they learned about Shaklee's HealthPrint, believing that the companies had maybe merged or that Shaklee had purchased HealthPrint from Superior.  They also expressed concern regarding which plan was better for them and from which company to continue purchasing a HealthPrint. Another affidavit was from a potential Superior customer who stated that the two

19

HealthPrints seem to offer a similar healthcare assessment and that he is inclined to try Shaklee's first because it is cheaper. The last two affidavits were from Superior employees, who noted that they have received numerous calls and emails regarding the differences between Superior's and Shaklee's HealthPrints. The district court found only one affidavit—from the client unsure which HealthPrint service he was accustomed to—worthy of "some consideration, but not much." But the court did not make an explicit determination of whom this favor weighed in favor.

Shaklee argues that Superior's affidavits demonstrate that these customers in fact knew the difference between the two Healthprints because they sought advice as to which one better suited their needs; they were not confused as to the source of the product. We agree. Superior has not produced any evidence of a customer mistakenly taking Shaklee's Healthprint questionnaire and thinking he or she was actually purchasing Superior's HealthPrint blood tests. Accordingly, we find that this factor weighs in favor of Shaklee.

## IV.

After evaluating the individual findings as to each factor, we now consider the overall balance to determine the likelihood of confusion.

> Because the bottom line is the likelihood of consumer confusion, application of the *Frehling* factors entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the "overall balance." *See Frehling*, 192 F.3d at 1342; *see also Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 840 n. 17 (11th Cir.1983) ("We note that the district court should

20

not determine whether a likelihood of confusion exists by merely computing whether a majority of the subsidiary facts indicates that such a likelihood exists. Rather, the district court must evaluate the weight to be accorded the individual subsidiary facts and then make its ultimate fact decision.").

*Custom Mfg.*, 508 F.3d at 649-50. We determined above that Superior's "HealthPrint" is a suggestive and strong mark. However, we also found no actual confusion, which is given the greatest weight in this analysis. *See Frehling*, 192 F.3d at 1341. Based on the evidence presented to the district court, there seems to be no real possibility that a reasonable consumer would mistake the source of Superior's blood-test request form with that of Shaklee's free questionnaire, particularly where Superior's website is rife with references to the company's focus on laboratory work.

Furthermore, while the marks themselves are "indisputably similar" and the parties share similar advertising modes, the products themselves are dissimilar, and no evidence exists that Shaklee intended to reap the rewards of Superior's success. Because their customer bases partly overlap, this factor does not tip the balance either way.

Accordingly, it was not clear error for the district court to find that Superior has not established a likelihood of confusion. Because Superior did not satisfy its burden of persuasion on the first element required to succeed on a motion for a

21

preliminary injunction, the district court did not abuse its discretion in denying the

motion for preliminary injunction.  We therefore affirm the holding below.[5]

**AFFIRMED.**

---

[5] Of course, nothing herein precludes Superior from presenting more evidence at the trial of the permanent injunction.  All we say is, based on the record evidence at this juncture, Superior has not satisfied its burden of persuasion on the first element.